*In re* MOORE.

1. CONTEMPT—STATUTES.
   The statute providing that a person who has been duly subpoenaed as a witness in any court and who fails to attend according to the command of the subpoena and testify without a reasonable excuse shall be deemed guilty of a contempt of the court out of which such subpoena issued provides that the person's conduct is to be measured by the terms of the subpoena (CL 1948, § 617.74).

2. PROCESS—SUBPOENA—VERBAL INSTRUCTIONS OF SERVER.
   The command of a subpoena is not altered by the verbal instructions of the person who serves such process.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 12 Am Jur, Contempt, § 14.
[3] 12 Am Jur, Contempt, § 72.

3. CONTEMPT—ONE-MAN GRAND JURY—"FORTHWITH" SUBPOENA.
   Person upon whom a *subpoena duces tecum,* signed by a circuit
   judge, served at 1:30 p. m. on Saturday mentioned in sub-
   poena commanding him to appear on said date "at forthwith
   noon" was not guilty of contempt of court in failing to appear
   at telegraph office where circuit judge, sitting as a one-man
   grand jury, held a session lasting until after 2 p. m. on such
   date, and subpoena did not direct the person to attend at such
   place, notwithstanding oral instructions to go to the tele-
   graph office given him by the process server, and witness tried
   to call the circuit judge at the courthouse, by telephone, and
   finally saw the judge after court on following Monday (CL
   1948, §§ 617.74, 767.3).

Appeal from Saginaw; O'Neill (James E.), J.
Submitted June 7, 1949. (Docket No. 8, Calendar
No. 44,084.) Decided September 8, 1949.

Charles Moore was found guilty of contempt of
court. Reversed and defendant discharged.

*Stephen J. Roth,* Attorney General, *Donald W.
Gilbert,* Assistant Attorney General (*Kenneth W.
Cole,* of counsel), for the people.

*Neithercut & Neithercut* (*Ford Kennedy,* of coun-
sel), for defendant.

SHARPE, C. J. This is an appeal from an order of
the circuit court of Saginaw county holding Charles
Moore guilty of contempt.

The facts which enter into this proceeding are as
follows: Upon the complaint of the prosecuting at-
torney of Saginaw county a one-man grand jury was
held in Saginaw county before Hon. James E. O'-
Neill, circuit judge. On Saturday, February 14,
1948, the grand jury officials went to the Western
Union office in the city of Saginaw to obtain infor-
mation regarding the whereabouts of one "race horse
ticker." As a result of information obtained in the

telegraph office, a *subpoena duces tecum* was issued over the signature of James E. O'Neill, circuit judge, directed to Charles Moore, defendant, 438 S. Weadock commanding him to appear "at forthwith noon, to testify and give evidence in the above matter now pending in said court." The subpoena reads as follows:

"To Charles Moore, 438 S. Weadock
You are commanded, that laying aside all and singular your business and excuses, you be and appear before the Honorable James E. O'Neill, Judge of the 10th judicial circuit of Michigan, at Saginaw in the county of Saginaw, on the 14th day of February, A.D. 1948, at forthwith noon, to testify and give evidence in the above matter now pending in said court and that you bring with you and then and there produce all books, papers and records in your possession and under your control relating to the matter above referred to and particularly News Service ticker, teletype and all other equipment and instruments in connection therewith at or near 110 Fraser St Saginaw and in the name of H. P. Hise, Carl Framer, Henry Framer, any one or any combination thereof

"And for failure to attend and to produce said books, papers and records, you will be deemed guilty of contempt of court and suffer the penalties thereof in accordance with the statutes in such case made and provided.

"Witness, the Honorable James E. O'Neill, Circuit Judge, at Saginaw, on the 14th day of February A.D. 1948.

"Seal                    (signed) James E. O'Neill
                         James E. O'Neill, Circuit Judge."

The subpoena was delivered to Charles Moore at his residence at 1:30 p.m., on the date above mentioned. After the subpoena was delivered, Charles Moore tried to call Judge O'Neill at the court house, but obtained no answer. He then drove to the court

house, found the doors locked and failed to gain admission. He then returned to the Western Union office sometime after 2 p.m., and again tried to reach Judge O'Neill at the court house by telephone. On the following Monday, February 16, 1948, Charles Moore called the court house by phone, and was referred to the clerk's office and by someone there to the assignment clerk who advised him to see Donald W. Gilbert, assistant attorney general, who in turn advised him to see Judge O'Neill. Charles Moore went directly to the court house, but was unable to see Judge O'Neill until after court on Monday.

On Tuesday, February 17, 1948, the original *subpoena duces tecum* was filed in the circuit court signed by William A. Wackerly certifying that he had served "the within subpoena upon the within named witnesses: Charles Moore, at 438 S. Weadock St., in the city of Saginaw, Michigan" at 1:20 p.m., on February 14, 1948. On February 17, 1948, an affidavit of William A. Wackerly was filed alleging that he was an investigator for the Michigan liquor control commission and assigned to the grand jury proceedings in the circuit court for the county of Saginaw; that he telephoned Charles Moore advising him that he had a subpoena for his appearance forthwith; that it was necessary for Charles Moore to furnish information and records as he might have concerning certain telegraphic equipment alleged to be located at 110 Fraser street in the city of Saginaw; that when he handed Charles Moore the subpoena, he advised him that it was necessary for him to appear forthwith and that failure to do so might put him in a position to be judged in contempt of court.

On the same day Donald W. Gilbert, assistant attorney general, filed a petition in the circuit court of Saginaw county for an order to be issued by said court to Charles Moore to show cause why he should

not be punished for criminal contempt. On the same day an order to show cause was issued directed to Charles Moore to appear before the court on February 25, 1948, at 9:30 a.m., to show cause why he should not be punished for criminal contempt. On the day above mentioned Charles Moore appeared and filed a motion to dismiss the petition and order for the following reasons:

"I

"That sections 17217 and 17218, Compiled Laws of 1929,* which are sections 28.943 and 28.944 of Michigan Statutes Annotated, under which the one-man grand jury proceedings are conducted, are unconstitutional and void for the reason that they deprive the respondent of the due process of law guaranteed to all citizens by the Fourteenth Amendment to the Constitution of the United States.

"II

"That the subpoena served on the respondent did not designate any place that he was to appear.

"III

"That there is no proof before the court of the service of the said subpoena on the said respondent as required by the statutes and the rules of court of the State of Michigan before a person can be cited for contempt.

"IV

"That the said respondent did obey the command of the said subpoena and did all that he knew it was possible to be done to obey the commands of said subpoena on Saturday afternoon, February 14, 1948, and within one hour after the said subpoena was served on him, and the conduct of this respondent was that of a law-abiding, cooperative citizens subpoenaed to appear before a court of justice.

---

* CL 1948, §§ 767.3, 767.4.—REPORTER.

"V

"That the conduct of the respondent, Charles Moore, did not obstruct the grand jury proceedings."

The trial court refused to pass upon the motion to dismiss the petition until certain testimony had been taken.

William A. Wackerly was sworn and testified:

"*Q.* Tell us what that conversation was.

"*A.* When I dialed the number, a male voice answered. I asked who was speaking and the other party said that it was Charles Moore. I identified myself as being an investigator for the Michigan liquor control commission and advised the party I had a subpoena on Western Union officials, requesting certain information in regard to a teletype ticker machine that we knew to be located at 110 Fraser street in the city of Saginaw and we wanted verification by Western Union's records of the same. The party informed me that he worked out of the Chicago office, directly under the service superintendent, and he took no orders from anybody in the Saginaw area and was not responsible to anyone in the Saginaw area. I then advised him that my subpoena covered any Western Union employee or official. He then stated that he had no knowledge of the machine that I was inquiring about. I informed him that he did have knowledge because he was the service man who took care of the machine. The party then said, 'All I know is, it is somewhere on Fraser street. I know the house but I don't know the number.' I asked what block the house was located in and he said that it was either the 100 or 200 block. I asked him the location of the house in the particular block and he said it was in the middle of the block.

"I then asked for a description of the house and he said that it was a white house. He then said, 'Why do you have to bring me into this?' He then said, 'I know all these boys.' 'The people at the city hall

know where it is, why don't you ask them?', he said. I informed him that at the present time we were not interested in anybody at the city hall, that we wanted information from the Western Union. He then asked me why he should have to come to the Western Union office. I told him it was because the Grand Juror, Honorable James E. O'Neill, was then on the way to the Western Union office to hold a session of grand jury. He said if he were to come there, somebody would have to pick him up because he had no car. I said that I would pick him up. I asked for a description of the house where he lived and he said that it was a green apartment house on the corner of South Weadock and Thompson streets. He also advised me not to pick him up for at least an hour because he still had his working clothes on and was not dressed. He also stated that if he was to appear as a witness before the grand jury that he was entitled to witness fees and would not appear unless he was paid. I advised him that that would be taken care of. This conversation all took place in the presence of Mr. Gilbert, assistant attorney general, and Mr. Ellison who was in the vicinity of the telephone.

"His response was made to me. I did the talking. I know that the subpoena was given to me by the assistant attorney general to serve on Mr. Moore and I was instructed by you (Mr. Gilbert) to serve Mr. Moore with a subpoena.

"*Q.* And then what did you do?

"*A.* At about 1:30 p.m. on the afternoon of February 14, 1948, at that time I went to the residence at 439 South Weadock, knocked at the door of an apartment there and a gentleman answered the door. I asked him if he was Charles Moore and he said that he was. He invited me into the house. I then told Mr. Moore who I was and that I had a subpoena to serve on him. I asked Mr. Moore if he could read and he said that he could. I presented to him the original subpoena and the copy of it and I said to read the original subpoena and return it to me and

for him to keep the copy. He read over the subpoena very thoroughly and handed the original back to me.

"When I say that I handed the original subpoena I was referring to people's exhibit 1. When I entered the home there was a young man approximately 22 or 23 years old, dressed in an army jacket, in the same room we were in. I was not introduced to him although I did have some conversation with the young man. Charles Moore handed back the original subpoena to me.

"*Q*. And just tell us what other conversation there was, if any, what else happened there.

"*A*. He immediately stated that he felt he was entitled to some legal opinion, some legal advice, regarding the matter before he responded. That is, to the request of the subpoena. I noticed there was a telephone in the room and advised him he could call an attorney and he could tell the attorney that the subpoena had been served on him and explain the situation to him. He said that his attorney was in Chicago. I explained to him, I didn't think the court would want to be delayed 2 or 3 days while he used an excuse like that to delay the proceedings. At about this time the young man in the room picked up the copy of the subpoena and began to look at it and said that there wasn't anything on the subpoena that indicated it had immediate effect. I brought out the point that it was a 'forthwith' subpoena and then he raised the point that there was nothing in the subpoena that said that Mr. Moore had to go to 110 Fraser street. Mr. Moore, the respondent here, he then asked me if it was necessary for him to go to 110 Fraser street. On account of the conversation had previously over the telephone, that he knew the house but not the exact address, I told him they possibly might want him to point out the house.

"*Q*. You told him it was not necessary for him to go with you?

"*A*. After that he still raised the point to the effect he would be entitled to legal advice before proceeding to pay any further attention as far as the

subpoena was concerned. I again produced the original subpoena. He didn't want to go. I warned him, pointing to the signature of the judge, Judge O'Neill, told him that it was Judge O'Neill's signature, he understood that. He still said that he was going to contact his attorney. I told him that I wanted him to distinctly understand before I left the premises that under the law no authority had been given me from anywhere, nor was I to make any threats or promises, but if he didn't comply with the subpoena, he might be thereby judged in contempt of court. He still said that he wanted to talk with his attorney before he did anything about it. I left the apartment and went down the steps. I retraced my steps and came up on the porch, Mr. Moore was at the door, I told him, '110 Fraser street is under surveillance of the police,' and I told him that I didn't want him to tip off any of the boys that we were after that ticker machine. I left there and went to Fraser street.   *   *   *

"*Q*. Did Mr. Moore, at any time, ask you to take him to Judge O'Neill?

"*A*. There was no conversation, either over the phone or at the residence, whereby Mr. Moore volunteered to appear before Judge O'Neill, or asked me to take him to him, other than when I talked with him over the telephone, he said, 'If somebody wants me to appear before the grand jury at the Western Union office, they will have to pick me up because I have no car.'

"*Q*. That's one of the reasons you went to his house, because Mr. Moore had no car and if he was to appear before the grand jury, somebody would have to come and pick him up?

"*A*. Yes, sir.

"*Q*. Did he ever mention that again?

"*A*. When I went to the house, no, sir, he never mentioned that again.

"*Q*. I believe that that is all."

Following the testimony of William A. Wackerly, the circuit judge ordered Charles Moore to take the stand and testify. At the conclusion of Charles Moore's testimony, the circuit judge found Charles Moore guilty of contempt of court and imposed a fine and costs upon him.

Upon leave being granted, Charles Moore appeals and urges that his motion to dismiss the petition should have been granted for the reasons stated in said petition.

It is the contention of the people that the word "forthwith" in the subpoena meant "immediately;" that its meaning is not controlled by the time limit set forth in Court Rule No 9 (1945), which the people claim deals with matters of practice and does not purport to deal with commands of a subpoena; that its meaning when used in a subpoena depends upon the circumstances and nature of the thing to be done; and that in the case at bar respondent was aware of the necessity of immediate compliance.

CL 1948, § 767.3 (Stat Ann § 28.943), provides authority for the one-man grand juror to compel attendance of witnesses and reads as follows:

"Whenever by reason of the filing of any complaint, which may be upon information and belief, any justice of the peace, police judge or judge of a court of record shall have probable cause to suspect that any crime, offense, misdemeanor or violation of any city ordinance shall have been committed within his jurisdiction, and that any person may be able to give any material evidence respecting such offense, such justice or judge in his discretion may, and upon the application of the prosecuting attorney, or city attorney in the case of suspected violation of ordinances, shall require such person to attend before him as a witness and answer such questions as such justice or judge may require concerning any violation of law about which he may be questioned; and

the proceedings to summon such witness and to compel him to testify shall, as far as possible, be the same as proceedings to summon witnesses and compel their attendance and testimony, and such witnesses shall be entitled to the same compensation as in other criminal proceedings."

While CL 1948, § 617.74 (Stat Ann § 27.923), provides:

"Every person who shall be duly subpoenaed as a witness in any court within this State　*　*　*　shall be bound to attend according to the command of such subpoena and testify; and for every failure so to attend and testify, without a reasonable excuse, shall be deemed guilty of a contempt of the court out of which such subpoena issued."

The above statute provides that defendant's conduct is to be measured by the terms of the subpoena. It is an admitted fact that the subpoena was served on Charles Moore at about the hour of 1:30 p.m., on February 14, 1948; that at the time the subpoena was served, the grand juror was holding a session of the grand jury at the office of the Western Union and remained there until shortly after 2 p.m., of the same day. If defendant was to appear before the grand jury at the office of the Western Union, he had not to exceed 45 minutes to do so before the grand juror left the office of the Western Union. We do not think that under the circumstances of this case the word "forthwith" as used in the subpoena required such hasty compliance. Defendant's efforts to reach Judge O'Neill after the judge left the office of the Western Union have been heretofore related. His efforts to reach Judge O'Neill were those of a normal person. It is to be noted that the subpoena did not inform defendant that he was to appear before the grand juror at the office of the Western Union. The command of the subpoena was not al-

tered by the verbal instructions of the process server. In our opinion defendant was not in contempt in failing to go directly to the Western Union office, in failing to phone Judge O'Neill at his home or in failing to make a personal investigation as to when the grand jury would again convene. Moreover, defendant's course of conduct in going to the court house and his attempts to reach Judge O'Neill were not indicative of an intent to evade the command of the subpoena. In our opinion defendant's actions in the premises were not contemptuous.

The judgment of the circuit court is reversed and defendant discharged.

BUSHNELL, BOYLES, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.